This case was originally assigned to another judge on the Alabama Court of Criminal Appeals. It was reassigned to Judge Cobb on January 17, 1995.
Homer Eugene Ivey, the appellant, was convicted of reckless endangerment, disorderly conduct, and aggravated stalking. He was sentenced to serve 12 months in the county jail for the conviction for reckless endangerment, 3 months in the county jail for disorderly conduct, and 15 years in the state penitentiary for aggravated stalking. *Page 181 
The sentences were to be served concurrently.
 FACTS
The conduct that resulted in the appellant's convictions stemmed from his actions toward Mrs. Ivey, his wife of 33 years, from whom he was estranged. The appellant and Mrs. Ivey were involved in divorce proceedings at the time of the offenses. Evidence of the appellant's infliction of physical abuse and threats of future abuse persuaded the trial judge presiding over the appellant's divorce proceeding (DR-93-415) to issue a temporary restraining order (TRO) on May 12, 1993, enjoining the following conduct by the appellant:
 "1. The Defendant is to cease pushing, grabbing, bruising, threatening her and/or striking the Plaintiff in any manner whatsoever.
 "2. The Defendant is to cease coming about the place of employment of the Plaintiff [First United Methodist Church], except on Sundays, to attend church, or coming about any home in which the Plaintiff resides.
 "3. The Defendant is to cease contacting or harassing the Plaintiff in any manner whatsoever."
R. 464.
On June 8, 1993, Mrs. Ivey filed a petition requesting that the appellant be held in contempt of court for violating the TRO. Her petition alleged on the following:
 "2. Defendant ignored said order and on one occasion drove to Birmingham, Alabama, where the Plaintiff was residing with her daughter and yelled at the Plaintiff from his vehicle until forced to leave by police. Defendant also made repeated attempts to contact the Plaintiff by letter and phone and made threats to the Plaintiff.
 "3. On May 28th, 1993 a pendente lite hearing was held at which the above conduct was described and the Domestic Referee orally continued the restraining order. On June 3rd, 1993, while Plaintiff was having her hair done, Defendant presented himself at Mr. Mac's, a hair salon in Gadsden, and attempted to engage the Plaintiff in conversation. Defendant left after being asked to do so by the owner, but subsequently returned and harassed the Plaintiff as indicated by the attached report.
 "WHEREFORE, Plaintiff moves this Court to set this case for a final hearing and to set a hearing and find the Defendant in contempt and impose such sanctions to ensure compliance with the restraining order."
R. 451.
The relevant portion of the incident report, referenced in the complaint and dated June 3, 1993, stated the following:
 "The suspect came to Mac's beauty salon while the victim was there as a customer. The suspect came up to a window and said to the victim, 'I don't want to beat you up. I just want to talk.' Suspect left, then came back and sat in the parking lot, pretending to shoot a gun at the victim, much like a child would pretend. Suspect left, then returned again [at 2:25 p.m.] while responding police officer] was still present. The suspect also called the business to try to speak to the victim; however, the victim refused to speak with him. May be stalking."
R. 454.
At the beginning of the hearing on the contempt petition[1] the appellant admitted the factual allegations forming the basis of the contempt petition and was allowed to present testimony in his own behalf to show justification for his actions. The appellant testified regarding serious problems with his mental condition, his physical health, his employment, his financial condition, his anger over the divorce and alcoholism. On cross-examination the appellant testified that it was a coincidence that he saw his wife at Mac's hair salon and that he did not speak to her at that time but only drove through the *Page 182 
salon's parking lot. The appellant testified that he passed her driving on Interstate highway 759 one day and that he then saw her in downtown Gadsden four or five minutes later and the resulting confrontation ultimately led to in his arrest for disorderly conduct.
City of Gadsden police officer Christopher Adam Crisler testified on behalf of Mrs. Ivey at the proceedings on the petition for contempt. He stated that on June 8, 1993, he was dispatched to the First United Methodist Church, Mrs. Ivey's place of employment, where someone had found a .357 magnum Remington Peters soft-nose lead cartridge in a blue styrofoam cup at the rear entrance. While he was discussing the significance of the bullet with church personnel, the church received a telephone call from Mrs. Ivey, who was calling from her car phone. The call prompted Crisler to go outside where he saw the appellant in his truck blocking the street in front of Mrs. Ivey's automobile. He heard the appellant shout to her, "If you don't have your fucking ass home by midnight you are going to die." As the appellant started to drive away Crisler ordered him to pull over. R. 500. A loaded .380 caliber automatic pistol was lying on the front seat of the appellant's truck. There was also a loaded .357 Magnum revolver and Peters brand soft-nose lead .357 Magnum cartridges in the truck. These cartridges were the same type as the one found in the styrofoam cup at the church. Crisler swore out a warrant and arrested the appellant for disorderly conduct because the appellant was "yelling loudly at fifth and Chestnut, 'If [Mrs. Ivey's] fuckin' ass isn't home by midnight, [she's] gonna die.' " C.R. 71. This was in addition to the warrant sworn out by Mrs. Ivey for reckless endangerment because the appellant had attempted "to run [Mrs. Ivey] off the road while driving her vehicle." C.R. 2. On September 10, 1993, the grand jury later indicted the appellant for aggravating stalking in violation of 13A-6-91, Ala. Code 1975. That indictment charged the following:
 "[The appellant] did intentionally and repeatedly follow or harrass . . . Dorothy E. Ivey, and did make a credible threat, either expressed or implied, with the intent to place . . . Dorothy E. Ivey in a reasonable fear of death or serious bodily harm, and that his conduct in doing so violated a court order or injunction or a court. . . ."
C.R. 135.
Dorothy Ivey testified that on June 3, 1993, the appellant came to Mac's hair salon and said to her, "I'm not here to beat you up, I just want to talk to you." R. 508. Her hairdresser interceded and the appellant left. He then telephoned the salon twice, but Mrs. Ivey would not speak to him. The appellant then drove in front of the window of the salon and gestured with his hands as if to shoot Mrs. Ivey.
Mrs. Ivey testified that another morning she was travelling on Interstate highway 759 and the appellant tried to run her car off the road. She said that he drove away when he saw her pick up her car phone. She telephoned the police at that time, and the police told her to drive to city hall so that she could make an incident report. However, when she telephoned the church to report that she would be late for work she was told that the police were at the church and that she needed to go there. As she approached the church in her car, the appellant pulled up in his truck and started screaming at her. She telephoned the church from her car phone and an officer came out and apprehended the appellant. Mrs. Ivey concluded her testimony by stating that she was asking the court for some protection from the appellant.
Other witnesses testified expressing their fear that the appellant might harm Mrs. Ivey. The trial court found the appellant in contempt of court and sentenced the appellant to five days in the county jail as allowed by statute and ordered that the TRO remain in effect upon his release.
Gary Phillips, assistant district attorney, prosecuted the appellant on the three consolidated criminal charges of aggravated stalking, reckless endangerment, and disorderly conduct for the State of Alabama. At the trial on those consolidated charges Mrs. Ivey testified concerning an incident that occurred on May 8, 1993 (before the May 12, 1993, issuance of the TRO), in which, she said, the appellant struck her several times and placed her in such fear for her life that she fled to a *Page 183 
neighbor's home. Later that day, with the aid of her 28-year-old son, Mrs. Ivey returned home to pack some necessities to move to her daughter's home. When she did so the appellant told her, "You don't have to leave, and if you do I'll get you." R. 109, Vol. V. As she drove away she heard what sounded like a gunshot being fired from her house. The appellant telephoned the couple's children, making threats against Mrs. Ivey. She testified that on May 11, 1993, she filed for a divorce and requested a temporary restraining order. She also testified concerning the June 3, 1993, incident at Mac's beauty salon. She further testified that on June 7, 1993, the appellant followed her car despite her attempts to elude him and that he continued to follow her until he saw her making a call on her car phone. That night the appellant telephoned their daughter's house and threatened Mrs. Ivey. She testified concerning the incident on I-759 and the one later outside the First United Methodist Church. The appellant was arrested following this later incident. Mrs. Ivey testified that the appellant had also placed collect telephone calls to her identifying himself when he placed the call as "the stalker." R.R. 124, Vol. VI. He placed these calls as often as 20 times in one day. On June 22, 1993, the appellant telephoned and told Mrs. Ivey that she would "never have a minute's peace the rest of [her] life" if she divorced him. R. 125, Vol. VI.
Mrs. Ivey testified about an incident at a Christmas party in 1988 where the appellant struck her on the lip when she and the children were urging him to get help for his deteriorating mental condition. She said that because the appellant had been diagnosed as manic depressive as early as 1967, she was advised, after the incident, by a doctor to swear out a warrant for assault and battery against the appellant. She did so and the appellant was taken by the sheriff's office to the Baptist Hospital psychiatric ward and was later transferred to Carraway Hospital in Birmingham. Mrs. Ivey also testified as to the present and future financial condition of both her and the appellant. Mrs. Ivey said that she had inherited approximately $200,000 and that she might inherit as much as $300,000 more. She also testified about incidents of physical abuse beginning in 1968 and threats made by the appellant while he was in jail in 1993. Mrs. Ivey testified concerning the appellant's alcoholism and the effect alcohol has on medications he takes. Mrs. Ivey testified that the appellant had had extra-marital affairs. The pending divorce was also discussed. Extensive testimony was elicited from Mrs. Ivey regarding his, her, and their finances. The defense continually asked questions pointed at what Mrs. Ivey expected to gain by pursuing a felony stalking charge instead of a misdemeanor assault charge. The appellant attempted to show that Mrs. Ivey's accusations against him were vindictive and were part of a scheme, plan, and design to get a favorable divorce settlement.
 I.
The appellant contends that the contempt finding and the resulting sentence of five days in the county jail for violating the TRO issued against him during the divorce proceedings was a criminal conviction and that it thereby created a double jeopardy bar for the later criminal prosecution and conviction for aggravated stalking and reckless endangerment based on the same conduct.
The appellant relies on the "same-element" test found inBlockburger v. United States, 284 U.S. 299, 52 S.Ct. 180,76 L.Ed. 306 (1932), and reaffirmed by the United States Supreme Court as the sole criterion for judging double jeopardy claims in United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849,125 L.Ed.2d 556 (1993). "The 'same evidence [or element]' test ofBlockburger is stated as follows: 'Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.'Blockburger, 284 U.S. at 304, 52 S.Ct. at 182." State v.Patton, 669 So.2d 1002, 1004 (Ala.Cr.App. 1993).
The appellant was guilty of indirect criminal contempt. "An indirect contempt is defined as one committed outside the presence of the court and is characterized by the *Page 184 
act of disobeying judgment or orders of the court."Brooks v. Brooks, 480 So.2d 1233, 1235 (Ala.Civ.App. 1985). A finding of indirect criminal contempt requires knowledge of the court's order and willful disobedience of that order. SeeCommonwealth v. Allen, 506 Pa. 500, 486 A.2d 363, 369
(Pa. 1984), cert. denied, 474 U.S. 842, 106 S.Ct. 128,88 L.Ed.2d 105 (1985). Rule 33.1(b)(3)(b), Ala.R.Crim.P., defines indirect criminal contempt as follows:
 "(2) Willful disobedience or resistance of any person to a court's lawful writ, subpoena, process, order, rule, decree, or command where the dominant purpose of the contempt is to punish the contemnor."
The actual prohibited conduct is immaterial because the purpose of contempt of court " 'is to preserve the integrity of the court system itself, and not directly to preserve the 'peace and dignity of the State.' "[2] Ex parte Williams,799 S.W.2d 304, 306 (Tex.Cr.App. 1990) (" '[C]ontempt by its nature [is] a different offense from other criminal convictions, because its purpose is to preserve the integrity of the court system itself' ") (citing State v. Newell, 532 So.2d 1114 (Fla. Dist. Ct. App. 1988)); and State v. Sammons, 656 S.W.2d 862
(Tenn.Crim.App. 1982). Willful disobedience was proven by showing deliberate conduct by the appellant in violating the TRO. For contempt purposes, proof of prohibited conduct, regardless of its nature as long as it is prohibited, serves only to prove the element of willful disobedience. Willful disobedience of the court's order is the only element necessary to prove contempt of court.
The offense of aggravated stalking is defined in § 13A-6-91, Ala. Code 1975, as follows:
 "(a) A person who violates the provisions of Section 13A-6-90(a) and whose conduct in doing so also violates any court order or injunction is guilty of the crime of aggravated stalking."
Section 13A-6-90 provides as follows:
 "(a) A person who intentionally and repeatedly follows or harasses another person and who makes a credible threat, either expressed of implied, with the intent to place that person in reasonable fear of death or serious bodily harm is guilty of the crime of stalking."
Aggravating stalking not only requires proof of conduct violating § 13A-6-90, but also requires the additional element of willfulness derived from a defendant's deliberate disobedience of a court order. Therefore, contempt of court will not prohibit on double jeopardy grounds a criminal prosecution for aggravated stalking because aggravated stalking requires proof of elements *Page 185 
other than willful disobedience of a court's order.
"Reckless endangerment" is defined in § 13A-6-24, Ala. Code 1975:
 "(a) A person commits the crime of reckless endangerment if he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person."
Willful disobedience of a court's order is not an element of reckless endangerment. Therefore, a prior conviction for contempt of court will not support a double jeopardy claim as contemplated in Blockburger and Dixon.
Because contempt of court requires only the willful disobedience of a court order, and aggravated stalking and reckless endangerment require additional elements, each offense for which the appellant is charged requires proof of a statutory element that the other does not: therefore, the "same-element" test was not violated. Blockburger and Dixon
provides that two offenses are not the same if each offense contains an element not contained in the other.
 II.
The appellant contends that § 13A-6-91(a), Ala. Code 1975, as amended, which defines the offense of aggravated stalking, is unconstitutional on its face, because he says, as applied to the appellant's case, it violates the due process clause of the Alabama Constitution. Particularly the appellant contends that § 13A-6-91(a), when considered with 13A-6-90(a) and § 13A-6-92, is unconstitutionally broad and vague. According to the appellant, the statute is not sufficiently specific to forewarn possible offenders of its coverage and it subjects persons to arbitrary and uneven exercises of power by the state. This court has previously upheld Alabama's stalking statute against constitutional challenges of overbreadth and vagueness. SeeCulbreath v. State, 667 So.2d 156 (Ala.Cr.App. 1995); State v.Randall 669 So.2d 223 (Ala.Cr.App. 1995), and discussions therein.
 III.
The appellant contends that the trial court erred in denying his motion to suppress evidence because he says, that evidence was the fruit of an illegal warrantless search of his truck by officers Crisler and Phillips. He also contends that the court erred in denying his motion to suppress their testimony regarding the warrantless search. Testimony was presented that Officer Crisler seized a .380 caliber pistol that was in plain view inside the truck. Moments later Officer Phillips saw in plain view bullets that were ultimately determined to be bullets for a .380 caliber pistol and a .357 caliber pistol. After being informed that the .357 caliber bullets could not be fired from a .380 caliber pistol, Phillips searched the truck and found a .357 caliber pistol in a paper bag lying on the front seat.
Sufficient probable cause existed to justify the warrantless search of the appellant's truck.
 "The search of the appellant's car that followed the stop was justified by the automobile exception to the warrant requirement. 'It is well settled that a warrantless search of an automobile may be conducted where probable cause
and exigent circumstances co-exist.' Key v. State, 566 So.2d 251, 253-54 (Ala.Cr.App. 1990); Minnifield
[v. State], 390 So.2d [1146] at 1152-53 [(Ala.Cr.App. 1980)] (emphasis added in Sawyer). However, a showing of exigent circumstances is no longer required to search an automobile lawfully in police custody as long as that search is based on probable cause to believe that it contains contraband. United States v. Johns, 469 U.S. 478, 484, 105 S.Ct. 881, 885, 83 L.Ed.2d 890 (1985); Key, 566 So.2d at 254."
Sawyer v. State, 598 So.2d 1035, 1039-40 (Ala.Cr.App. 1992) cert. denied, 506 U.S. 943, 113 S.Ct. 386, 121 L.Ed.2d 295
(1992).
 " 'The law is clear that a warrantless search of an automobile is justified where there is probable cause to believe the vehicle contains contraband.' Lott v. State, 456 So.2d 857, 859-60
(Ala.Crim.App. 1984). 'The test for probable cause is "whether the facts available to the officer at the *Page 186 
moment of the seizure or search, would warrant a man of reasonable caution to believe that the action taken was appropriate." ' Lott, 456 So.2d at 860 (quoting C. Gamble, McElroy's Alabama Evidence, § 334.01(7)(b) (3d ed. 1977))."
Riley v. State, 583 So.2d 1353, 1355 (Ala.Cr.App.) cert. denied, 583 So.2d 1356 (1991).
The warrantless search of the appellant's truck was legal. The trial court correctly denied the appellant's motion to suppress the evidence seized as a result of the search and his motion to suppress the testimony of officers Crisler and Phillips concerning this search.
 IV.
The appellant contends that the trial court erred in denying his motion to suppress his oral statements made to Officer Moon while the appellant was in custody. The appellant alleges that these statements were made during an interview after the appellant had demanded to speak with an attorney and after he had indicated his desire not to make a statement to the police unless an attorney was present. Officer Moon testified that he read the appellant hisMiranda rights and that the appellant indicated that he understood these rights but that the appellant refused to sign a waiver of rights form and that he demanded an attorney. R. 35. After this demand Moon testified that he informed the appellant of the exact charges against him and the conditions of his bond. R. 34-35. Moon testified that the appellants' comments that followed were unsolicited. Moon stated that:
 "When I informed him that he was — of the complaint of aggravated stalking — he told me that if I wanted to know what stalking was I should watch 'Geraldo.' He went on to make a statement that the average sentence for a man convicted of stalking or killing his wife in the United States was 1.2 years. After I informed him of the conditions of his bond, which were that he not come within 100 feet of Mrs. Ivey while he was out on bond, he told me that 100 feet is not very far; that's about the distance from first base to home plate on a baseball field."
R. 35.
The record reflects that the appellant was informed of and that he understood his Miranda rights and that his comment to Officer Moon was voluntary and not in response to an "interrogation."
 " 'Miranda has never been held to apply to statements voluntarily made by defendants. If a defendant spontaneously volunteers information, either before or after being given the Miranda
warnings, those statements need not be suppressed.' United States v. Edwards, 885 F.2d 377, 387 (7th Cir. 1989). See also Crawford v. State, 479 So.2d 1349, 1352 (Ala.Cr.App. 1985) ('An unsolicited remark, not in response to any interrogation, does not fall within the Miranda rule'); United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.) ('The protections afforded a suspect under [Miranda] apply only when the suspect is both in custody and being interrogated. A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings.'), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992).
 " 'Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in Miranda].'
 "Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). See also Britton v. State, 631 So.2d 1073, 1078 (Ala.Cr.App. 1993); Williams v. State, 601 So.2d 1062, 1072
(Ala.Cr.App. 1991)."
Worthington v. State, 652 So.2d 790, 792-93 (Ala.Cr.App. 1994). *Page 187 
The circuit court ruled that the statements were voluntary. "The court's determination regarding voluntariness will stand up on appeal unless 'it appears contrary to the great weight of the evidence or is manifestly wrong.' " Williams v. State,620 So.2d 82, 86 (Ala.Cr.App. 1992) quoting Bush v. State,523 So.2d 538, 554 (Ala.Cr.App. 1988)." The ruling of the trial court is supported by the record. The statements made by the appellant were correctly received into evidence.
For the foregoing reasons, the judgment in this cause is due to be affirmed.
AFFIRMED.
All the Judges concur.
[1] The transcript from the hearing on the alleged violation of the TRO in DR-93-415 was received into evidence in the appellant's criminal case as defendant's exhibit number 35, and is part of the record on appeal. See R. 476-537.
[2] Before Dixon, "Most other jurisdictions addressing the criminal contempt/criminal conviction problem have concluded that double jeopardy does not bar convictions for both, but have relied on a variety of rationales." Ex parte Williams,799 S.W.2d 304, 306 (Tex.Cr.App. 1990). In Alabama a contempt proceeding is considered quasi-criminal. " 'A proceeding in contempt for noncompliance with a lawful court decree is suigeneris and not a "criminal prosecution" as that term is commonly understood. [Citations omitted.]' " Parcus v. Parcus, Maddox dissenting, 615 So.2d 78 (1993) (citing State ex rel.Payne v. Empire Life Insurance Co., 351 So.2d 538, 542
(Ala. 1977)); State v. Thomas, 550 So.2d 1067, 1072 (Ala. 1989). The law in Alabama before Dixon was that, "[a] conviction on an indictment will not purge a contempt, nor a conviction for a contempt be a bar to an indictment." Ex parte Evett, 264 Ala. 675,679, 89 So.2d 88, 91 (Ala. 1956) (the prohibition against double jeopardy did not bar a criminal prosecution for beating three men where defendants had already been adjudged guilty of contempt for violating a temporary restraining order issued during a labor dispute). However, further discussion is not necessary because the "same-element" test of Blockburger and Dixon was not violated in this case.
However we note that, "Neither civil [nor] criminal contempt is a crime under Alabama law. This is indicated by the limited punishment provided for criminal contempt in Ala. Code § 12-11-30 (1975). Criminal contempt constitutes a `violation.' See § 13A-1-2(2)." C.J. v. State, 552 So.2d 182,184, n. 2 (Ala.Cr.App. 1989). Alabama punishes contempt of court as a violation under § 13A-1-2(2) by a maximum of five days in jail. " `A criminal contempt is one in which the purpose of the proceeding is to impose punishment for disobedience to theorders of the court.' " Kendrick v. King, 263 Ala. 487, 490,83 So.2d 241, 244 (1955) (emphasis added) (citing Ex parte Dickens, 162 Ala. 272, 50 So. 218 (1909)). "The powers to punish for contempt . . . are vested in and limited to the court." Craddock v. Oliver, 23 Ala. App. 183, 184, 123 So. 87
(1929), cert. denied, 219 Ala. 607, 123 So. 88 (1929).